AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

FILED
At Albuquerque NM

for the

State and District of New Mexico

JAN 1 0 2012

MATTHEW J. DYKMAN
CLERK

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

904 West Sky Street SW, Albuquerque, NM 87121
as described in Attachment A, incorporated herein

)
)
)
)
)
)

Case No.  12 - MR - 40

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attacment A

located in the _____State and_____ District of _____New Mexico_____, there is now concealed *(identify the person or describe the property to be seized):*

See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 | Possession with intent to distribute a controlled substance; to wit, heroin. |

The application is based on these facts:

See attached Affadavit, Attachment A, and Attachment B, incorporated herein by reference

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ryan Breen, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  ____01/10/2012____

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico

W. Daniel Schneider, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

*The premises to be searched are described as a residential property located at 904 West Sky Street SW Albuquerque, New Mexico. It is located in Albuquerque in the county of Bernalillo. The building is a 1 story house, single car garage on right side with numbers 904 centered above garage door. The building is cream in color stucco, with a white garage door. The front door is left of garage facing west. The house faces west. There is a concrete driveway to the garage door. There is a wooden fence on the north side of house.  The yard is grey gravel.*

## ATTACHMENT B

1

## ITEMS TO BE SEIZED

1.    **Heroin**,  or other controlled substances;

2.    Written records and documents concerning heroin manufacturing and distribution including: coded, cryptic, or plain text pay and owe records pertaining to sales of **heroin** , amounts due, amounts collected, or amounts paid for the **heroin**, or their packaging and distribution;

3.    Personal and business books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

4.    Items of personal and business property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises subject to this warrant, including but not limited to regulatory agency licenses, canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, other identification documents, and keys;

5.    Documents indicating travel and interstate commerce, in particular transportation between Mexico and New Mexico, including airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel, and car

2

rental statements; correspondence with travel agencies and other travel-related businesses; airline, car rental, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel disclosing acquisition of assets and personal or business expenses;

6.   Income tax returns, W-2 and W-4 forms, receipts, and other documents pertaining to the filing of personal and business tax returns;

7.   Photographs of **Marco Cordova, or any associates**.

8.   Written business documents, ledgers, address books, telephone toll records, notes, messages, photographs, and video films, and encrypted memoranda indicating drug sales, debts, and criminal affiliates; wire transfer records, money orders, and cashiers checks; bank account records, including checking and savings.

9.   Electronic pagers and their contents, cellular telephones and their contents, caller identification devices and answering machines, telephone records, disks and tapes, and all electronic information contained within these devices.

10.  Proceeds and evidence of proceeds including: United States

currency, money orders, cashier's checks, precious metals, jewelry, stocks and bonds or related investments, firearms, vehicles, real property, or stolen goods, Federal and State tax records, loan records, mortgages, deeds, titles, certificates of ownership, and registration of documents, records disclosing investments and securities, safe deposit box rental records and keys and photographs;

11.  Drug related equipment, paraphernalia, packaging material, weapons (including rifles, shotguns and handguns) related to the conspiracy to distribute **heroin**, distribution of **heroin**, possession with intent to distribute **heroin** and money laundering.

12.  Latent prints from seized items or from surfaces at locations searched.

13.  The search warrant will include all vehicles, lock boxes, safes, persons present, sheds and outbuildings at the residence.

14.  During the course of the search, photographs of the searched premises may also be taken to record the condition thereof and/or the location of items therein.

In the Matter of the Search of
The property and premises
located at

**904   West   Sky   Street   SW
Albuquerque, New Mexico.**
As more fully described in
Attachment A, incorporated
herein by reference


### AFFIDAVIT

The Affiant, Special Agent Ryan Breen, from the Department of
Homeland Security, Immigration and Customs Enforcement (ICE),
Homeland Security Investigations (HSI), being first duly sworn,
hereby state as follows:

### INTRODUCTION AND AGENT BACKROUND

1.  Your Affiant has been employed by the Department of Homeland
Security, Immigration and Customs Enforcement (ICE), Homeland
Security Investigations (HSI) since December 26, 2010.  Prior to
employment with ICE/HSI, your Affiant was employed as a Federal
Air Marshal stationed in both Boston, Massachusetts and as an
Instructor for Federal Air Marshals in Artesia, New Mexico from
May 2002 to December 2010.  Your Affiant has also been employed
as a Border Patrol Agent with United States Border Patrol
stationed in Alamogordo, New Mexico from August 1997 to May 2002.
 During that time your Affiant was assigned as the Prosecutions
Officer for the Alamogordo Station and as Task Force Officer
assigned to the Drug Enforcement Administration in Las Cruces,
New Mexico.  Your Affiant is currently assigned to the Office of
the Assistant Special Agent in Charge, Albuquerque, where your
Affiant's duties include the investigation of individuals
involved in the illegal possession and trafficking of controlled
substances including violations of Title 21, United States Code,
§ 841.

2.  Your Affiant has successfully completed twelve weeks of Criminal Investigator training at the Federal Law Enforcement Training Center (FLETC).  In addition, your Affiant completed twelve weeks of Special Agent training with HSI, also at FLETC. Your Affiant has accumulated the following training and experience: identifying controlled substances, narcotics related investigative techniques, interview and interrogation training, and identifying common methods of packaging and concealment used by narcotics traffickers.  In addition, you Affiant has participated in searches of premises, and assisted in the gathering of evidence by means of a search warrant.

3.  The information contained in this affidavit is not an exhaustive account of everything your Affiant knows about this case. Rather, it contains only the facts that your Affiant believes are necessary to establish probable cause in support of a search warrant against subject identified as Marco Cordova for violation of Title 21, United States Code, Section 841(a) (possession with intent to distribute a controlled substance; to wit: **heroin)**.

4.   The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## RELEVANT STATUTES

5.   This investigation concerns alleged violations of Title 21, United States Code, Section 841(a) (possession with intent to distribute a controlled substance; **to wit heroin**).

6.   Title 21 United States Code, Section 841(a)(1)prohibits a person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; **to wit heroin.**

## BACKGROUND REGARDING NARCOTICS TRAFFICKING

7.  Based upon my training, experience, and participation in other investigations involving heroin trafficking, my conversations with other experienced investigators and law enforcement agents with whom I work, and interviews of individuals who have been involved in the trafficking of heroin, I have learned and know the following:

a.   It is common to find papers, letters, billings, documents, and other writings, which show ownership, dominion, and control of businesses, residences, and/or vehicles in the business, residence and vehicles of heroin traffickers.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises also include canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, keys, financial papers, rental receipts and property ownership papers, personal and business telephone and address books and telephone toll records; and other personal papers or identification cards in the names of subjects involved in the criminal activity being investigated.

b.    It is common for heroin dealers to secrete proceeds of illegal narcotics sales and records of illegal narcotics transactions in secure locations within their businesses, residences, and/or vehicles for their ready access and to conceal from law enforcement authorities.

c.    Heroin traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of **heroin.**

d.    **Heroin** traffickers commonly maintain books, records or other recorded information relating to names, addresses and/or telephone numbers of their suppliers and customers with whom they engage in illegal controlled substance transactions.

e.    Persons involved in heroin trafficking conceal in their businesses and residences caches of heroin, large amounts of currency, jewelry, and other items of value and/or proceeds of illegal controlled substance transactions as well as evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in illegal heroin trafficking activities.

f.    Heroin traffickers amass large proceeds from the illegal sale of controlled substances that they attempt to legitimize. To accomplish these goals, heroin traffickers utilize domestic

8

banks and their attendant services, securities, cashier's checks,
safe deposit boxes, money drafts, real estate, shell operations,
and business fronts.  Persons involved in heroin trafficking
and/or money laundering keep papers relating to these activities
for future reference.

g.    **Heroin** traffickers very often place assets in corporate
entities in order to avoid detection of these assets by
government agencies.

h.    **Heroin** traffickers very often place assets in names other
than their own to avoid detection of these assets by government
agencies, and that even though these assets are in other
individual or business names, the heroin dealers actually own and
continue to use these assets and exercise dominion and control
over them.

i.    I am aware that the courts have recognized that unexplained
wealth is probative evidence of crimes motivated by greed, in
particular, illegal trafficking in heroin.

j.    I know that evidence relating to ownership and interest in
real property is located at the residences, businesses and banks
of **heroin** traffickers.

k.    I know that heroin traffickers take, or cause to be taken,
photographs or videos of themselves, their associates, their

9

property, and their product.  These traffickers usually maintain these photographs or videos in their possession.

l.    I know that heroin traffickers must maintain large amounts of United States currency in order to maintain and finance their on-going illegal heroin trafficking business.

m.    I know that heroin traffickers utilize pagers, mobile telephones, and phone answering machines for ready access to their suppliers and clientele for the purpose of maintaining their illegal trafficking business. Persons involved in drug manufacture and sale commonly use electronic pagers, cellular telephones, caller identification devices, and phone records to conduct their business. Such equipment often contains recorded evidence of these illegal activities.

n.    I know that it is common for heroin dealers to also sell paraphernalia and other items which are associated with the sale and use of heroin and controlled substances such as scales, containers, cutting agents and packaging materials associated with the manufacturing, processing and distribution of controlled substances, and that these items may be located in their businesses, residences, storage lockers, and/or vehicles.

o.    I know that heroin traffickers commonly have in their possession, that is, on their person, and/or at their businesses,

10

residences, storage lockers, and/or vehicles, firearms, and other weapons, which are used to protect and secure their property.

p.   I am aware that courts have recognized that evidence of illegal trafficking of controlled substances, such as the items described above, is likely to be found where the dealers live even if the distribution or transaction did not occur at the residence.

q.   The aforementioned items are often maintained in the **heroin** traffickers' businesses, residences, public and private storage facilities, and/or vehicles where the trafficker has access to them.  These records are commonly kept for an extended period of time.

r.   I know that manufacturers and distributors of **heroin** and other drugs frequently try to conceal their identities by using fraudulent names and identification cards.  Once identities have been created or stolen from other citizens, clandestine manufacturers will use those identifications to falsify records such as Department of Motor Vehicle and phone records for the purpose of theft of services and to evade detection by law enforcement.

s.   Based upon my training and experience, as well as the corporate knowledge and experience of other agents and police

11

officers in my office, I am aware that it is a common practice
for drug traffickers to store their drug inventory and drug-
related paraphernalia (as described above) in their residences,
their vehicles, in private and public storage lockers and in
their private businesses.  Further, it is a common practice for
drug traffickers to maintain in their residences, storage
lockers, and businesses, records relating to their drug
trafficking activities.  Because drug traffickers in many
instances will "front" (that is, sell on consignment) controlled
substances and/or **heroin** to their clients, or alternatively, will
be "fronted" these items from their suppliers, such record-
keeping is necessary to keep track of amounts paid and owed, and
such records will also be maintained close at hand so as to
readily ascertain current balances.  Often drug traffickers keep
"pay and owe" records to show balances due for drugs sold in the
past (pay) and for payments expected (owe) as to the trafficker's
supplier and the trafficker's dealer(s).  Additionally, drug
traffickers must maintain telephone and address listings of
clients and suppliers and keep them immediately available in
order to efficiently conduct their drug trafficking business.
t.   It is also a common practice for traffickers to conceal at
their residences, vehicles, storage lockers and businesses large

sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances.  Drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained at the business or residence.

u.    I have knowledge and that drug traffickers will file tax returns, but either improperly report their actual earnings by not reporting earnings from their drug activities, or claim earnings not actually earned, in order to legitimize purchases and expenses not consistent with their actual legitimate earnings.  These also are documents commonly found in trafficker's residences, storage lockers, vehicles, and places of business.  Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs

v.    Persons who traffic in heroin commonly reap substantial proceeds from their activities. I know that proceeds from drug trafficking and money laundering are subject to forfeiture under

13

federal law, including Title 21 United States Code, Section 853.
These proceeds are often received and kept as, or are converted
to: money orders, cashier's checks, precious metals, jewelry,
stocks and bonds or related investments, firearms, vehicles, real
property, or stolen goods.

w.    Persons involved in the importation, distribution and
possession with intent to distribute heroin frequently keep on
hand, in secretive locations, large quantities of cash obtained
from their sales and used to facilitate other drug related sales
transactions.  Such funds allow the seller to purchase new
supplies of drugs to replenish their stocks depleted by ongoing
sales.  Other documents evidence purchases, expenditures made
with these unlawful proceeds including Federal and State tax
records; loan records; mortgages, deeds, titles, certificates of
ownership, and registration of documents; records disclosing
investments and securities; safe deposit box rental records and
keys and photographs. I know from my training and experience that
often items of value are concealed by persons involved in large
scale drug trafficking inside of safes, lock boxes, and other
secure locations within their residences, outbuildings, and
vehicles.  Accordingly, I seek to search these areas and to seize
such items of value for forfeiture.

14

x.   Persons involved in illegal drug distribution, manufacture and sales often utilize false identities and fake identification to facilitate their distribution activities.  I know they also use "straw purchasers" - purchasing items in the names of other people while keeping the real interest in the asset.  They also commonly purchase, keep, or maintain valuables and assets, including vehicles and real property, in the names of the prior owners, relatives, friends, or dummy businesses or names in an attempt to hide wealth, complicate police efforts to discover or track their activities and acquisitions, and to avoid legal forfeiture if they are apprehended for selling or manufacturing controlled substances;

y.   I know from my training and experience, that drug traffickers consider drug related equipment, paraphernalia, packaging material, weapons (including rifles, shotguns and handguns) to be tools of their trade, and that they are often located together with instrumentalities of the crime of distribution and trafficking in narcotics.  Accordingly, I seek to seize these items, records, and assets that are of evidentiary value in the prosecution of persons for the manufacture, sale, and possession of listed heroin.

z.    Narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances.   I also know that the aforementioned paper and electronic books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them.   These documents include travel records, receipts, airline tickets, auto rental agreements, invoices, and other memorandum disclosing acquisition of assets and personal or business expenses.   I also know that the most promising place to find such items is within narcotics traffickers' residences and at their businesses.

## DETAILS OF INVESTIGATION

7.   On January 10, 2012, Agents from the Region II Narcotics Taskforce contacted the Office of the Assistant Special Agent Albuquerque (ASAC/AL), New Mexico concerning the travel of Jason SAIS, a known drug trafficker to the Albuquerque area to purchase an unknown amount of heroin.

8.   Agents from the ASAC/AL began surveillance of SAIS' vehicle, a 2004 white Monte Carlo bearing NM license plate 382 RXA, (registered to Jason SAIS at 1100 Hill Street, Farmington, New Mexico) after it arrived in the Albuquerque area, beginning at the I-25 and 550 interchange. Agents then maintained constant surveillance of the vehicle and followed it to 6320 Churchill Road, SW in Albuquerque, New Mexico.

9.   At approximately 1430 Agents observed the white Monte Carlo depart from the residence at Churchill occupied by Jason SAIS,

17

Jessica GARCIA, and an unknown male wearing a red sweatshirt, later identified as only "Robert".

10. At approximately 1434 Special Agent (SA) Jacob Dye observed the white Monte Carlo park across the street from 904 West Sky Street SW, in Albuquerque, New Mexico.  At that time SA Dye observed "Robert" exit the vehicle and enter the residence located at the above address through the door at the northwest corner of the house.

 11. At 1437 SA Dye observed "Robert" exit the house and go to the driver's side window of the Monte Carlo, and then go back inside the house after speaking with SAIS.

12.  At 1440 SA Dye observed "Robert" come back to the white Monte Carlo and engage with SAIS and then again return inside the house.

13.  At approximately 1443 SA Dye observed "Robert" exit the residence and get in the Monte Carlo at which time the vehicle left the location.  At approximately 1450 Agents observed the Monte Carlo arrive the Churchill address where all three occupants got out of the car and entered the residence.

14. At approximately 1518 SAIS and GARCIA left the residence and got in the Monte Carlo and left.  At 1545 SAIS and GARCIA were stopped by New Mexico State Policeman Troy Velasquez and SAIS was arrested on a state of New Mexico felony warrant issued out of San Juan County.

15. During a search of GARCIA, SA Abbey Kepf recovered drug paraphernalia including syringes, spoons, and pipes from the crotch area of GARCIA.  It should be noted that one of the syringes contains a black viscous substance consistent with heroin.  The substance later field tested a presumptive positive for the presence of heroin.

16. After the arrest Agents from ASAC/AL and Region II Narcotics interviewed both SAIS and GARCIA and were relayed the following information.  SAIS stated that he and GARCIA traveled to Albuquerque from Farmington today to purchase heroin from "Robert".  SAIS said the left at approximately 1200 and arrived about 1400.  SAIS then called "Robert" to let him know they were in town and drove to his residence.  SAIS said that "Robert" got into his vehicle and they drove to another address, which was a light colored duplex.  SAIS said that "Robert" went inside for a moment and then came back outside to ask for money.  SAIS stated

he would not give the money until he saw the product (heroin). "Robert" then went back in the house and returned with a small amount of heroin for SAIS to look at.  SAIS agreed that it was okay and gave "Robert" approximately 200.00 in US Currency. "Robert" went back into the house and returned with several grams of heroin. SAIS stated that he observed a Maroon Mercedes-Benz at the duplex and a silver Mustang.  It should be noted that these vehicles were observed at the residence by Agents and that the Mercedes has temporary tag indicating a recent purchase.

17. SAIS, GARCIA, and "Robert" then returned to "Robert's" residence where they injected themselves with the heroin.

18. During SAIS' interview he also told Agents that he could score multiple ounces from "Robert" and that he got them from the duplex that they went to today.  SAIS was asked how much he could get and said that he could get 9 or 10 ounces at a time if he had the money.

19. SAIS stated the heroin was from Juarez and was black tar heroin that was common to the area and was sold by multiple dealers that he knew.  SAIS also stated that "Robert" told him the unknown occupant of the house made trips to Juarez, and on one occasion was unable to sell to them because he was in Mexico.

20. "Robert" told SAIS that unknown occupant had recently purchased the Mercedes-Benz and was bragging about the amount that it cost.

21. SAIS believed that it was the same car that he saw at the house today.

22.  Record checks on the property and the Mustang reveal that they are both registered to Marco Antonio CORDOVA.  CORDOVA returns a criminal history showing arrests for distributing a controlled substance, possession with intent to distribute marijuana, and is currently on supervised release from US Probation in Tucson, Arizona.

23. Based upon the aforementioned information Agents are requesting the execution of the search warrant after 10:00 PM due to the fact that the information was not received until later in the day and all facts were not known until recently.  We feel if the search warrant is not executed in a timely manner we feel there is a chance for evidence to be moved or destroyed.

## CONCLUSION

24.  Based upon all of the information set forth in this application, and my training and experience, I respectfully submit that there is probable cause to believe that the instrumentalities, fruits, and evidence of violations of Tile 21, United States Code Sections 841 (a)(1), are present at 904 West Sky Street SW Albuquerque, New Mexico, as more specifically described in Attachment A.

25.  This affidavit has been read and approved by Assistant United States Attorney Steve Kotz of the state and District of New Mexico.


WHEREFORE, I respectfully request that a warrant be issued authorizing Homeland Security Investigations, with appropriate assistance from other law enforcement officers, to enter the said premises described in Attachment A and therein search for, seize, and examine the items set forth above and in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.   FURTHER AFFIANT SAYETH NOT.

_____.
                    Ryan Breen Special Agent
                    Homeland Security Investigations

Subscribed and sworn before me this 10th day of January, 2012.


W. Daniel Schneider United States Magistrate Judge